**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

BOARD OF EDUCATION OF       \*
MONTGOMERY COUNTY, *et al.*,

                             \*

      Plaintiffs,

                             \*

   v.                           Civil Action No. 8:18-cv-00840-PX

                             \*

J.M., *et al.*,

                             \*

      Defendants.

                         \*\*\*

## <u>MEMORANDUM OPINION</u>

Pending in this Individuals with Disabilities Education Act ("IDEA") case are the parties' cross-motions for summary judgment. ECF Nos. 28, 34. The Board of Education of Montgomery County and the Montgomery County Public Schools Superintendent (collectively, "MCPS") appeal the decision rendered in *J.M. v. Montgomery County Public Schools*, issued November 22, 2017, OAH No. MSDE-MONT-OT-17-12208 by Latonya B. Dargan, an Administrative Law Judge of the Maryland Office of Administrative Hearings. The matter has been fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the reasons below, MCPS' motion for summary judgment is DENIED (ECF No. 28) and J.M.'s motion for summary judgment is GRANTED. ECF No. 34.

### I.      Background

#### a.      The Individuals with Disabilities Education Act (IDEA)

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1412(a)(1)(A). A FAPE provides to disabled children "meaningful access to the educational process" in "the least restrictive environment" that is "reasonably calculated to confer 'some

educational benefit.'" *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *2 (D. Md. July 23, 2018) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). Although "the benefit conferred . . . must amount to more than trivial progress," the IDEA "does not require that a school district provide a disabled child with the best possible education." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must prepare and implement an individualized educational plan ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal."). The IEP addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in an inclusive school classroom with non-disabled students. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing 20 U.S.C. § 1414(d)(1)(A)); *see also J.R. v. Smith*, No. DKC 16-1633, 2017 WL 3592453, at *1 (D. Md. Aug. 21, 2017).

Parents play a critical role in the IEP process. They are granted the opportunity to participate in not only the creation of the IEP but are invited to the annual IEP review and any subsequent meetings to modify the IEP. *See* 20 U.S.C. §§ 1414(d)(1)(B)–1415(f); *see also M.M. ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 527 (4th Cir. 2002). Once an IEP is finalized, parents may accept or reject it. If parents reject the IEP as failing to provide a FAPE, they may pursue administrative remedies before an Administrative Law Judge ("ALJ") at a Due Process hearing. In the interim, parents may pay for services, to include placement in a private

school, and seek reimbursement from the state. *E.S.*, 2018 WL 3533548, at *2 (quoting 20 U.S.C. § 1412(a)(1)(C)(iii) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). Either party may challenge the outcome of the Due Process hearing by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

Against the backdrop of this remedial scheme, the Court turns to J.M.'s case.

### b. Factual History[1]

J.M. was born in January 2006. At approximately four months old, J.M.'s parents grew concerned about his development, noticing significant crying and difficulty feeding. The Parents brought J.M. to Montgomery County's Infants and Toddlers Program, where he received occupational therapy and other services until he was three-and-a-half years old. Tr. 176.

At about eighteen months old, the Parents first noticed J.M.'s lack of focus. J.M underwent an assessment at Georgetown University Hospital, which identified in J.M. decreased muscle tone (generalized hypotonia), delayed motor coordination and communication skills, and mild, recurring paralysis on his left side (hemiplegia). P. Ex. 2-1; Dec. 6. At two and a half, J.M. was diagnosed with multiple developmental delays, including "significant language delay, motor and self-regulatory difficulties, and emotional immaturity and insecurity." P. Ex. 2-2.

In 2009, J.M. graduated from the Infants and Toddlers Program and began attending Montgomery County's Pre-School Education Program ("PEP") Classic, a program designed to assist children with developmental challenges. Tr. 177. In 2010, J.M. transitioned to PEP-Pilot, a program that includes children with and without developmental challenges. *Id.* at 179. While attending PEP, J.M. also attended the Maddux School part-time. The Maddux School is a

---

[1] Factual citations are to the underlying administrative record and are also generally consistent with the ALJ's findings of fact. Citations to the record conform to the following format: the Parents' exhibits appear as "P. Ex. __"; MCPS's exhibits as "MCPS Ex. __"; the transcript as "Tr. __"; and the ALJ Decision as "Dec. __."

private school serving children with developmental and learning disabilities. J.M.'s teachers at Maddux noted that he often displayed such symptoms as inattention, easy distractibility, vulnerability to making careless errors, trouble remembering multiple steps, and difficulty starting and completing tasks independently. Pl. Ex. 2-3. In 2011, J.M.'s speech-language pathologist also noticed his trouble breaking tasks down to their component parts and understanding lengthy or complex questions. She found that he performed best when given clear structure and redirection. Pl. Ex. 4-1.

Further evaluations in 2013 revealed that J.M. struggled with expressive and receptive language, following directions, and formulating sentences. Pl. Ex. 3-7. Dr. William Stixrud, Ph.D., a neuropsychologist, evaluated J.M., noting that J.M. scored below average in working memory and processing speed but above average in verbal and nonverbal cognitive functioning. Pl. Ex. 2-5. J.M. also exhibited above average intellectual potential. *Id.* at 6. Dr. Stixrud ultimately diagnosed J.M. with attention-deficit/hyperactivity disorder ("ADHD"), anxiety disorder—not otherwise specified, developmental coordination disorder, mixed receptive-expressive language disorder, learning disorders in Reading, Math, and Written language, and autism spectrum disorder.[2] *Id.* at 13. Dr. Stixrud also "strongly suspect[ed] that [J.M.] will fare best in a small and supportive special education program that can provide intensive intervention to address his multiple areas of need." *Id.* at 14.

J.M.'s mother, Mrs. M.,[3] also observed that J.M. struggled in extracurricular activities. J.M. had attempted to play soccer but "he couldn't manage the amount of kids, and it just

---

[2] Dr. Stixrud's precise written diagnosis was "pervasive developmental disorder—not otherwise specified"; however, in the medical profession, the underlying symptoms are now referred to as "autism spectrum disorder," to which the parties referred during the Due Process hearing. Tr. 420.

[3] Because J.M.'s mother has the same initials as J.M., she will be referred to as Mrs. M.

became too overwhelming and he just cried, he shut down." Tr. 242. J.M. also had difficulty

maintaining focus and composure in a ten-person Hebrew class. He cried and disrupted the class

until Mrs. M., a special education teacher herself, developed a smaller class for two other

children and J.M. Tr. 210.

In September 2014, Mrs. M. requested that MCPS develop an IEP for the 2015–16

School Year, in anticipation of J.M.'s graduation from the Maddux School. Pl. Ex. 5-1. Shortly

thereafter, Dr. Stixrud evaluated J.M. again. Dr. Stixrud concluded that J.M. possessed average

to above average cognitive skills alongside significant weaknesses in working memory and

processing speed. Pl. Ex. 6 at 3. Dr. Stixrud also noted that J.M., despite working very hard,

found it difficult to remember exact directions and maintain focus when test items became too

challenging. *Id.* at 2. Dr. Stixrud also recommended reassessing J.M. in one year to determine

whether J.M. should maintain the diagnosis of autism spectrum disorder. Dr. Stixrud recognized

that because J.M.'s "progress in the social/emotional domain appears to be very rapid . . . he may

be one of the children who, according to recent research, actually seem to 'outgrow' their autism

spectrum disorders as they get older." *Id.* at 6–7; MCPS Ex. 62-5–6.

Dr. Stixrud formalized his observations and conclusions in two reports. The first,

provided to the Parents, included a formal diagnosis of autism spectrum disorder. MCPS. Ex.

62-6. The report recommended:

> In my view, [J.M.] has an extremely complex set of educational
> needs. He requires specialized and highly individualized instruction
> in all academic skill areas, and all of his basic academic instruction
> will need to be provided in individual and very small group contexts
> (e.g., no more than three children) due to his significant language
> disorder and attentional limitations. Also, because of his significant
> language disorder, [J.M.] requires a very strong focus on the
> promotion of language skill development throughout the school day,
> and this intervention will need to be provided by professionals who
> are skilled at facilitating language development (including a

speech/language pathologist and appropriately trained teachers). Additionally, given [J.M.'s] language, attentional, motor, and social disorders and his significant learning disabilities, he will need specialized small group instruction in social studies and science, as well as additional adult support in "specials" and unstructured times such as lunch and recess. Furthermore, [J.M.] requires social skill support and adult facilitation of peer relationships, particularly during unstructured periods of the school day. Finally, [J.M.'s] motor needs will necessitate.direct [sic] occupational therapy, In [sic] addition to his speech/language therapy. In my opinion, meeting [J.M.'s] needs would be impossible outside of a full-time special education program.

*Id.*

In response, Mrs. M. emailed Dr. Stixrud, notifying him that the Parents were applying for J.M. to attend the Lab School of Washington. Mrs. M. asked Dr. Stixrud whether "his report need[ed] rewriting to fit their format or what they [were] looking for? Any tricks or buzz words I should use in his report?" MCPS. Ex. 54. Dr. Stixrud subsequently revised the report, although he did not identify the new report as "revised." The second report omitted the diagnosis of autism spectrum disorder, and instead recommended that J.M. be followed "to determine whether an autism spectrum diagnosis still applies." Both versions of the report also omitted J.M.'s anxiety diagnosis.

In keeping with the substance of his original recommendations, Dr. Stixrud's revised report now recommended:

In my opinion, [J.M.] has a highly complex set of educational needs and requires placement in a school program that can offer a low student/teacher ratio and that has the ability to provide intensive intervention to remediate his significant language-based learning disabilities. [J.M.] will require specialized and highly individualized instruction in all academic areas, and this instruction will need to be provided in individual and very small group contexts. Also, I would like to see [J.M.] receive speech/language therapy onsite and to see the goals from his language therapy be addressed throughout the day.

P. Ex. 6 at 7.

6

Dr. Stixrud later, in a sworn declaration submitted to the ALJ, stated that revisions to reports are often requested by parents and schools. Dr. Stixrud further noted that "[i]f a requested revision remains consistent with my data and professional judgment, I have no problem with revising a report when I believe it is in the best interest of the child." P. Ex. 73-2.

In fall 2014, Suzanne Blattner, Ed.S., the Parents' educational consultant, formally observed J.M. at the Maddux School. Ms. Blattner noted that J.M. displayed "[d]ifficulty with multi-step directions and plans" and "[n]eeds regular check-ins to make sure he is on target." Pl. Ex. 7-2. Marie Marino, a Learning and Curriculum Specialist at the Maddux School who separately observed J.M., described him as "very anxious" and found J.M.'s short attention span to present significant problems for him in the educational setting. P. Ex. 10-1–2. Erin Joseph-Hamilton, an MCPS speech-language pathologist also observed J.M., and while not identifying attention as an issue, noted his difficulties with comprehension and expression. P. Ex. 14-2. Ms. Joseph-Hamilton, subsequently confirmed J.M.'s struggles with verbal expression. P. Ex. 15.

Based on the above information, the IEP for J.M.'s third grade (the 2015–16 School Year) recommended placement for J.M. at the Learning and Academic Disabilities program at Beverly Farms Elementary School ("Beverly Farms"), his neighborhood public school. P. Ex. 18-1. The IEP further provided J.M. with 6 hours 15 minutes of special education outside general education, 10 hours 25 minutes of special education inside general education, 1 hour of speech-language pathology, and 12 hours 20 minutes of general education without special education instruction per week. P. Ex. 18-40. J.M. also was to receive the following support services during instructions and testing: oral reading of text, visual cues, math tools or computation devices, graphic organizers, visual organizers, extended time, multiple breaks, writing answers in testing booklets rather than separate sheets, monitoring of test responses, and

reduced distractions.  P. Ex. 18-17–22.  Across all academic settings, J.M. would receive use of highlighters, checks for understanding, repeated directions, peer tutoring, picture schedule, wait time for oral responses, verbal and visual cues, modeled clear speech, visuals in instructions, advanced preparation before calling on J.M., reduced visual distractions on the page, modified assignments, breaking assignments down into smaller units, sensory tools, and preferential seating.  P. Ex. 18-23–27.  The IEP did not address J.M.'s anxiety or provide any occupational therapy.

The Parents rejected the MCPS IEP, instead enrolling J.M. in the Lab School of Washington for his third-grade year.  P. Ex. 20-1.  The Lab School is a private school designed for students with learning disabilities or ADHD, focusing on teaching concepts through experiential and creative learning.  Tr. 21, 85.  Class sizes range from one to thirteen students taught by faculty who are almost all certified in special education.  Tr. 92, 88.  The Parents requested that MCPS fund J.M.'s tuition at the Lab School, but MCPS declined.  P. Ex. 20-2.

The 2015–16 Lab School IEP provided J.M. with full-time specialized instruction in special education, with 45 minutes per week of individual occupational therapy, 90 minutes per week of individual speech-language therapy, and 45 minutes per week of group speech-language therapy.  P. Ex. 22-1.  J.M. also received extended testing time, advance notice of tests, extra time for processing information and formulating his responses, paraphrasing of directions, preferential seating near the teacher, repetition of directions, small group setting, supervised movement breaks during testing, administration of tests at J.M.'s best time of day or over multiple days, and verbatim reading of the test or vocabulary.  P. Ex. 22-14.

When J.M. began at the Lab School, his reading, math, and written language all placed at a first-grade level.  By the end of that year, J.M. was reading and performing math at a third-

grade level and his written language was at a second-grade level.  P. Ex. 32-2–4.  He had also

progressed on five out of six reading objectives, developed skills in all five writing objectives,

and progressed in two of four math objectives, with developed skills in the other two math

objectives.  P. Ex. 31-7–9.

For J.M.'s fourth-grade year (2016–17), MCPS began developing his IEP in August

2016.  J.M. was evaluated by Ms. Joseph-Hamilton and Kathleen Policastro, M.S., Certified

School Psychologist at MCPS.  P. Ex. 44, 45.  On April 6, 2017, the IEP was finalized.  MCPS

Ex. 2.  Like the previous MCPS IEP, this IEP again recommended placement at Beverly Farms,

but increased provision of services to include 14 hours 10 minutes in special education inside of

general education, 7 hours 30 minutes in special education outside of general education, one hour

of speech-language therapy outside general education, 30 minutes speech-language therapy

inside general education, and 6 hours 50 minutes inside general education without special

education per week.  MCPS Ex. 2-57.  J.M. would also receive 30 minutes of occupational

therapy monthly.  *Id.*

The IEP also recommended the following instructional and testing accommodations: oral

reading of text, visual cues, notes and outlines, electronic word processors, ability to respond on

test booklets, monitoring of test responses, math tools and calculation devices, graphic

organizers, spelling and grammar devices, visual organizers, extended time on class assignments

and tests, multiple breaks, and reduced distractions.  MCPS Ex. 2-21–26.  Across all academic

settings, J.M. could use highlighters, receive checks for understanding, repeated directions, use

of manipulative and organizational aids, paraphrased instructions, alternate ways to demonstrate

learning, proofreading checklist, word bank, multi-step directions broken down into single units,

use of imagery, verbal and auditory cues, extra time for oral and written responses, advance

notice of assessments, simplified sentences, vocabulary and graphics, breaking down of assignments into smaller units, oral rehearsing of answers before writing, supervised movement breaks, structured time for organizing materials, and preferential seating. MCPS Ex. 2-27–34.

Once again, the Parents disagreed with the MCPS IEP as to the placement and the frequency of occupational therapy. P. Ex. 59-2. The Parents again enrolled J.M. in the Lab School and requested MCPS to pay the tuition. P. Ex. 64-1. MCPS again declined. P. Ex. 64-3.

The Lab School IEP for J.M.'s fourth-grade year provided J.M. with full-time specialized instruction in special education, with 90 minutes per week of individual occupational therapy, 90 minutes per week of individual speech-language therapy, and 45 minutes per week of group speech-language therapy. P. Ex. 32-1. The IEP also added individual administration of tests to the other supports J.M. had been receiving. P. Ex. 32-15. By the end of the year, J.M.'s reading scored at a third-grade level, his math had increased half a grade to the middle of a third-grade level, and his written language was middle of second grade level. P. Ex. 60-3–4. For reading, J.M. had mastered, with cues, five of eight objectives, completely mastered two objectives, and had developed skills for the remaining objective. P. Ex. 62-8. For math, J.M. mastered two of seven objectives and one additional objective with cues, but displayed inconsistent skills of the remaining objectives. P. Ex. 62-10. For writing, J.M. mastered with cues four of six objectives and continued to develop skills for the remaining two. P. Ex. 62-9.

The Lab School also noted that J.M. exhibited inconsistencies in academic behavior and executive functioning goals. P. Ex. 62-11. For his speech-language goals, J.M. made inconsistent or no progress on his objectives. P. Ex. 52-12. For his occupational therapy goals, he developed inconsistent skills on some objectives and regressed on others. P. Ex. 62-13.

For J.M.'s fifth-grade year, the 2017–18 School Year, the Lab School IEP provided the

same hours in special education instruction as the previous school year.  P. Ex. 60-1.  However, the IEP modified test administration for J.M to be conducted in areas with minimal distractions.  P. Ex. 60-21.  For machine-scored tests, J.M. would be allowed to mark the test booklets, and school personnel would later transfer to his responses to the answer sheet.  MCPS did not create a new IEP for the 2017–18 School Year, as it finalized the previous IEP in April 2017.  MCPS Ex. 2.

### c.        Procedural History

In April 2017, the Parents filed a Due Process Complaint against MCPS, seeking reimbursement for the costs of placing J.M. at the Lab School for the 2015–16 and 2016–17 school years, as well as a placement at the Lab School for the 2017–18 School Year.  P. Ex. 1.  MCPS opposed, arguing that its proposed placement at Beverly Farms provided J.M. a FAPE.  Administrative Law Judge ("ALJ") Latonya B. Dargan of the Maryland Office of Administrative Hearings held a seven-day Due Process hearing during which 11 expert witnesses testified and 135 exhibits were introduced into the record.

On November 22, 2017, the ALJ found in favor of the Parents and ordered tuition reimbursement as well as placement in the Lab School.  The ALJ determined that MCPS had not provided J.M. a FAPE but that placement at the Lab School met J.M.'s educational needs and thus did provide J.M. FAPE.  Pursuant to the IDEA, MCPS appealed the ALJ's Decision to this Court on March 22, 2018.  ECF No. 1.  The parties then filed cross motions for summary judgment in this Court.  ECF Nos. 28, 34.

## II.      Standard of Review

At the Due Process Hearing, the party challenging the student's placement bears the burden of proving by a preponderance of the evidence its respective position as to provision of a

FAPE. Both parties are permitted to call witnesses and introduce evidence. At the conclusion, the ALJ renders findings of fact and law.

This Court conducts a "modified de novo review," of the ALJ's determination, giving "'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002); *see also T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, No. 17-1877, 2018 WL 3579681, *6 (4th Cir. 2018); *Wagner v. Bd. of Educ. of Montgomery Cty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004). This Court must consider findings of fact "made in a regular manner and [with] evidentiary support" to be presumptively correct. *MM*, 303 F.3d at 530–31. Where a reviewing court does not adhere to such factual findings, the court must explain its reasons for deviating. *Id.*; *see also Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

Having accorded the ALJ's findings of fact such weight, the Court is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. The Court may, for example, "believe[ ] that the evidence considered as a whole point[s] to a different legal conclusion," despite accepting the factual findings of the officer below. *See Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, this Court must not substitute her "own notions of sound educational policy for those of the school authorities." *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014). Further, Plaintiffs—here MCPS—carry the burden of proof in this Court, as they are the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party to determine whether any disputed issue of material fact precludes entering judgment in the movant's favor as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III.    Analysis

MCPS contends that the ALJ erred in concluding that MCPS did not provide J.M. with a FAPE and in ordering tuition reimbursement for the Parents' unilateral placement of J.M. in the Lab School. More particularly, MCPS argues that the ALJ's findings of fact were not regularly made and that the ALJ assessed the case under the wrong legal standards. The Court addresses each of MCPS' contentions in turn.

### a.    Witness Credibility Determinations

MCPS alleges that the ALJ made credibility determinations unsupported by the record, which compel reversal. MCPS further contends that the ALJ contravened the IDEA's mandate to accord the school district great deference. *See E.S*, 2018 WL 3533548, at *7 (quoting *M.M.*,

303 F.3d at 530–31).  The Court disagrees.

An "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *S.A. v. Weast*, 898 F. Supp. 2d 869, 877–78 (D. Md. 2012).  An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va*, 516 F.3d 254, 259 (4th Cir. 2008).  Thus, the Court defers to the ALJ's factual determinations when, after an evidentiary hearing, the officer resolves the factual disputes "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.*; *see also Doyle,* 953 F.2d at 104 (holding that a reviewing court should generally not "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility") (internal citation omitted).

Although an ALJ, like the Court, may not "substitute [her] own notions of sound educational policy for those of the school authorities which [she] review[s]," "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1001–02. Importantly, "[t]o conclude that the hearing officer erred simply because [s]he did not accept the testimony of the School Board's witnesses . . . would render meaningless the due process rights guaranteed to parents by the IDEA." *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir. 2005).

A review of the record demonstrates that the ALJ properly credited the Parents' expert witnesses based on their qualifications and bases for opining as to J.M.'s educational needs. After conducting a painstaking review each of the eleven expert opinions, the ALJ found "the

Parents' witnesses and documentary evidence to be more persuasive on the issue of [J.M.'s] ability to access his education curriculum." Dec. 55–69. The ALJ grounded her decision in noting each expert's extensive training and experience in the special education field coupled with an opportunity to observe and interact with J.M. The ALJ particularly noted that the Parents' special education expert, Dr. Jennifer Durham, Ph.D., the curriculum coordinator at the Lab School and Director of the Masters in Special Education Program at American University, "presented as very knowledgeable of [J.M.] and his particular set of needs." *Id.* at 55; *see also* P. Ex. 69-1–2. Durham's testimony especially persuaded the ALJ in part because Durham had taught J.M. math for six weeks and acted as his case manager. Tr. 27.

Special Education expert, Richard Weinfeld, M.Ed., corroborated Durham's opinion. With over thirty years in the field, twenty-six of those years in leadership positions, Weinfeld had observed J.M. at the Lab School. Weinfeld also attended a fifth-grade[4] math class at Beverly Farms. P. Ex. 66-1, 36-1. Likewise, Dr. Stixrud, a practicing neuropsychologist since 1985 and published author in the field, also agreed with Durham. *See* P. Ex. 68-1. The ALJ noted that Dr. Stixrud "presented as a knowledgeable witness in terms of general professional expertise, as well in terms of understanding [J.M.'s] profile as a person and student with disabilities." *Id.* at 59–60. Finally, the ALJ accepted Mrs. M. as an expert in special education because she had taught special education in both public and private schools since 1995, and as J.M.'s mother, possessed unparalleled familiarity with J.M.'s educational and other related needs. *See* P. Ex. 65-2. The ALJ, therefore, credited their collective opinion that Beverly Farms would not provide J.M. a FAPE as did the Lab School.

In contrast, although the ALJ noted that MCPS witnesses possessed the requisite

---

[4] J.M. would be entering the fifth grade in the 2017–18 School Year.

education and experience in their respective disciplines, few, if any, met or observed J.M. with the same depth and frequency as the Parents' experts. Dec. 70. This determination is supported in the record. Elizabeth English, the MCPS expert in occupational therapy, and Erin Joseph-Hamilton, the expert speech-language pathologist, were the only two who ever met J.M. English had interacted with him twice, and Joseph-Hamilton observed or interacted with him four times. Tr. 686, 690, 709, 717, 791. Of particular note, MCPS special education expert Rachel Orgel testified that she had never met J.M., and, as a result, because "we didn't know [him], it's hard to know the best way to evaluate him." Tr. 632, 573. Orgel based her assessment of J.M. instead on "students with much higher needs," even while acknowledging that "humans are all, you know, individually unique." Tr. 650, 679. Jacqueline Hongladarom, expert in special education, became familiar with J.M. through "just a review of the files and through information that [she] heard from the parents and the team at a couple of IEP meetings." Tr. 984. Faith Schwartz, expert in psychology and school psychology, stated, "My knowledge of [J.M.] is paper knowledge." Tr. 944.

Importantly, the ALJ did not reduce her decision to siding with the experts who had more meetings with J.M..[5] Rather, the ALJ's decision depended on the strength of the expert evaluations as to J.M. In this respect, the ALJ's determination can hardly be considered a coin flip. Given the complexity of J.M.'s disabilities, the ALJ's decision to give greater weight to those experts who possessed a deeper understanding of how to best address his needs is precisely

---

[5] Along a similar vein, MCPS contends that affirming the ALJ's decision will improperly incentivize Parents to place their children unilaterally in private schools in contravention of the IDEA. This argument has already been considered and rejected by this Court. *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery Cty.*, 148 F. Supp. 2d 576, 587 (D. Md. 2001) ("MCPS's disturbing interpretation would also place parents of such children in the untenable position of acquiescing to an inappropriate placement in order to preserve their right to reimbursement. The Supreme Court has expressly rejected saddling parents of disabled children with such a pyrrhic victory.") (citing *Burlington*, 471 U.S. at 369–70). Unilateral placement in a private school is quite the gambit for those parents who, in the end, do not receive reimbursement. More to the point, the task at hand is to review the ALJ's determination, which, in this Court's view, remains on sound footing.

the role that the ALJ must play in determining whether J.M. is receiving a FAPE.

MCPS, however, levies several criticisms against the Parents' witnesses. First, MCPS objects to Mrs. M. having been qualified as an expert. However, at the hearing, MCPS lodged "no objections" to her admission as an expert and, stunningly, put no questions to her. Tr. 172. MCPS further claims Mrs. M's views are hopelessly biased. The ALJ considered Mrs. M's potential bias against Beverly Farms, but ultimately found that Mrs. M's testimony "dispelled any sense she was ever predisposed against sending [J.M.] to [Beverly Farms]." Dec. 64. Indeed, Mrs. M. testified that she "would have loved to have [J.M.] go to Beverly Farms," because J.M.'s siblings had attended. Tr. 181–82. Mrs. M. also explained her "mixed emotions" about sending J.M. to a self-contained special education school. Tr. 226–27. On this record, the Court cannot find that the ALJ did anything other than carefully weigh Mrs. M.'s credibility. *See also Kitchelt ex rel. Kitchelt v. Weast*, 341 F. Supp. 2d 553, 555 (D. Md. 2004) ("[Parents] may honestly believe from the beginning (and may ultimately be able to demonstrate) that the best education the public school system can give is not good enough . . . . The fact that the parents may hold this view cannot ipso facto amount to an automatic disqualification . . . ."). The Court finds no basis to disturb the ALJ's credibility determination as to Mrs. M.

MCPS next contends that the ALJ should have discounted Dr. Stixrud's opinion because he deceptively altered his 2014 report and purposely omitted J.M.'s diagnosis for anxiety. After careful consideration, the ALJ credited Dr. Stixrud's explanation for the omission. The doctor, found the ALJ, "was chagrined at his failure to include the anxiety diagnosis, a lapse he described as an 'oversight' on his part." Dec. at 62. The ALJ continued: "To put things bluntly: people—even competent, successful, and educated professionals with a wealth of knowledge in their chosen fields—make mistakes. . . . It is not, however, one that I find puts a dent in Dr.

Stixrud's overall credibility concerning his analysis about [J.M.] and his psychological and educational needs." *Id.* at 63. Similarly, the ALJ found that Dr. Stixrud's alteration of the report for submission to the Lab school regarding J.M.'s autism spectrum diagnosis did not damage his credibility because "this was always a borderline issue for him." *Id.* at 62. This finding is also supported in the record because both 2014 reports reflect Dr. Stixrud's hesitancy as to whether the diagnosis is proper. P. Ex. 6-6–7; MCPS Ex. 62-5–7. Thus, the ALJ made a reasoned finding as to Dr. Stixrud's credibility, which will be accorded due deference.

In sum, the Court accepts the ALJ's credibility determinations as regularly made.

### b. The ALJ's Legal Standards

MCPS next argues that the ALJ erred in the legal standard applied and her failure to make findings based upon the record evidence. As to the legal standard, the Court finds no error. The ALJ stated that she must first determine whether MCPS provided J.M. with a FAPE, and second, whether the private unilateral placement is "appropriate to the child's needs." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 320 (4th Cir. 2004). Accordingly, the ALJ correctly bifurcated her analysis, first discussing solely whether MCPS' IEPs constituted a FAPE (Dec. 54–72) and then separately addressing whether the Lab School was an adequate placement for J.M. Dec. 72–74; *see also Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 488 (D. Md. 2002) ("[T]hat a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting.").

The ALJ also fully explained that the legal standard for implementing a FAPE "calls for school system to place children in the 'least restrictive environment' (LRE) consistent with their educational needs." Dec. at 48 (quoting 20 U.S.C. § 1412(a)(5)(A)). The ALJ throughout her

analysis weighed whether J.M. could reasonably access the curriculum at an inclusive elementary school that mainstreamed J.M. such as Beverly Farms. Indeed, the ALJ identified the question of LRE as the lynchpin issue. Dec. at 54 ("[I]t is clear that the most significant area of disagreement between the parties lies in the question of whether [J.M.] could receive a FAPE if he spent the majority of the school day/week in the general education classroom."). After acknowledging that "mainstreaming is an important and laudable goal," the ALJ determined that, in light of J.M.'s individual strengths, limitations, and deficits, a self-contained special education classroom constituted the least restrictive environment to meet J.M.'s needs. *Id.* at 70.

MCPS next argues that the ALJ improperly shifted the burden of proof to MCPS to demonstrate that its proposed placement was the LRE. ECF No. 28-1 at 28. The Court finds no evidence of improper burden shifting. Although a hearing officer "should be reluctant to second guess" a procedurally proper IEP, *A.B.*, 354 F.3d at 325, courts "may fairly expect" the proponents of such placement "to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1002. If the ALJ finds that the School failed in this respect, that finding is not tantamount to burden-shifting. Rather the record demonstrates that the ALJ rightfully placed the burden on the Parents. Dec. 49 ("[T]he burden in this matter is on the Parents."), 69–71 (discussing the Parents' extensive evidence and finding it satisfied the burden of proof).

### c. The Annual IEPs

MCPS contends that, as to the MCPS 2015–16 IEP, the ALJ did not consider the services J.M. would have received at Beverly Farms and gave undue weight to evidence about J.M.'s experiences outside of school. *Id.* at 17. The 2015 MCPS IEP placed J.M. in general education

for approximately eighty percent of his school week and, for over forty percent of the week, offered no dedicated special education personnel inside the classroom. The ALJ referred to this time as "hours where [J.M.] receives no special education instruction, services, or supports." Dec. at 71. MCPS agrees that some of these hours would not have a dedicated special education instructor separate and apart from the general instructor. Tr. 649. However, MCPS points to the long list of support services that J.M. would receive across all academic settings and during instructions and testing, such as repetition of directions, verbal and visual cues, and multiple breaks.

Although the ALJ may have painted with too broad a brush in characterizing J.M.'s general education hours as entirely without services, the ALJ's more basic conclusion still stands. MCPS' proposed services could not sufficiently mitigate the structural shortcomings in providing J.M. a FAPE inherent in the general education setting. The ALJ relied on the substantial evidence that J.M. needed far more structure than Beverly Farms could provide. Dec. 70. And this finding is well supported in the record. For example, Ms. Blattner's observation of J.M. at the Maddux School in 2014 chronicled that "[J.M.] sat at the table with 3 other students but the teacher needed to stay close to him to ensure that he was on task. She checked and re-checked his work." MCPS Ex. 49. J.M. repeatedly had to check in with the teacher and have her explain the directions, all vital to making sure that J.M. was "on target" with his schoolwork. MCPS Ex. 49-1. J.M. also "needed some redirection to have his body face the teacher." *Id.* Based on the frequency and intensity of teacher intervention necessary to meet J.M.'s educational needs, Dr. Stixrud concluded that J.M. should be placed in a "very small group context" with a "low student/teacher ratio." Tr. 429. Dr. Daniel Shapiro, M.D., J.M.'s psychiatrist agreed, and recommended small classes with a high teacher ratio for support. P. Ex.

8-5; Tr. 195.  By contrast, the MCPS IEP simply did not provide for this environment necessary for J.M. to make educational progress.  *See, e.g.*, Tr. 707 (Joseph-Hamilton discussing pull out groups, stating that J.M. "needed a quiet environment free of distractions to learn those skills"); Tr. 1032–33 (Hongladarom concluding J.M.'s attentional deficits not addressed in 2015 MCPS IEP).

Similarly, the ALJ did not err in according some probative value to J.M.'s experiences at Hebrew school and soccer.  In both activities, J.M. became overwhelmed by the group size and could not function.  Tr. 210, 242.  While Hebrew school and soccer may not bear direct resemblance to the Beverly Farms classrooms, the ALJ did not treat this evidence as dispositive but merely corroborative.  Dec. 69–70.  Based on the entire record evidence, this Court finds no grounds to upset the ALJ's determination that Beverly Farms did not afford J.M. a FAPE.

With regard to the 2016–17 IEP, MCPS argues that the ALJ did not consider whether the purported procedural error in delaying the IEP harmed J.M.'s educational progress, and that because the delay visited no harm to J.M., such error is reversible.  *See R.F. v. Cecil Cty. Pub. Schs.*, No. 18-1780,  -- F.3d --, 2019 WL 1319830, at *7 (4th Cir. Mar. 25, 2019) ("[N]ot all procedural violations of the IDEA result in a denial of a FAPE.").  To the extent MCPS is correct that the ALJ failed to consider the effect of the procedural violation, that consideration was not material to finding in favor of the Parents.  Rather, the ALJ reached the substantive question of whether placement at Beverly Farms under the MCPS 2016–17 IEP provided J.M. a FAPE and found it did not.  *See* Dec. at 54.  This determination is amply supported in the record.[6]  On this

---

[6] The ALJ's determination that the 2017 MCPS IEP did not provide a FAPE to J.M. is supported by Mr. Weinfeld's observations that J.M.'s needs "stood out" among his special education peers at the Lab School.  Tr. 325. J.M. was very dependent on the teacher's support and feedback.  *Id.*  By contrast, Mr. Weinfeld noted that the fifth-grade math class at Beverly Farms was "too big for [J.M.], even though it was a small group.  He needs a group of 2 or 3 students in math."  Tr. 362.  Ms. Mentrikoski, J.M.'s speech-language pathologist, also testified that J.M. needed a 2:1 ratio for reading, rather than the general education setting provided by MCPS.  Tr. 513, 532.  The Lab School's reports further corroborate that J.M. exhibited difficulty accessing the curriculum in groups larger than

basis alone, the Court affirms the ALJ's decision that MCPS failed to provide J.M. a FAPE. *See Gerstmyer v. Howard Cty. Pub. Sch.*, 850 F. Supp. 361, 364–65 (D. Md. 1994) (explaining that a child may be denied a FAPE in two sets of circumstances: either a serious procedural violation or the IEP is not reasonably calculated to enable the child to receive educational benefits).[7]

### d.  Placement at the Lab School

MCPS next contends that the ALJ erred in deciding that the Lab School provided J.M. a FAPE in light of his slowed progress during his second year. The Court again disagrees. The ALJ conducted a balanced and forthright assessment of J.M.'s areas of improvement and regression at the Lab School. Dec. at 34–35. The ALJ also credited the expert testimony explaining that J.M. had made great progress at the Lab School. *Id.* at 73. The ALJ noted areas of inconsistent growth, and then determined that, on balance, these did not undermine the conclusion that the Lab School aided J.M. in his educational progress. *Id.* at 34–35, 73 ("[S]taff saw meaningful growth . . . ."). Again, this determination is supported in the record. Tr. 523–25 (describing J.M.'s "slow and steady progress"); Tr. 101 (explaining inconsistent progress and concluding that J.M. "showed some nice growth"); *cf. R.F.*, 2019 WL 1319830, at *10 (holding that child received a FAPE where IEP set "reasonably ambitious goals," even though it "did not aim for grade-level advancement through the general curriculum"). Thus, this Court finds no grounds to overturn it.

Finally, MCPS argues that equitable considerations should reduce the amount of tuition

---

three. P. Ex. 41-4, 52-7; *see also* Tr. 652 (Orgel acknowledging that Beverly Farms classes are not "small").

 [7] The 2017 IEP has functioned as the MCPS IEP for both the 2016–17 and 2017–18 School Years. Thus, the ALJ's determination that J.M. did not receive a FAPE applies to both school years because "[t]he losing party in the dispute over the contested IEP" bears the burden of "producing evidence and persuading the court of changed circumstances that render the district court's determination as to the initial year inappropriate for guiding its order of relief for subsequent years." *See MM*, 303 F.3d at 537 (internal quotation marks omitted) (quoting *Andersen v. Dist. of Columbia*, 877 F.2d 1018, 1022 (D.C. Cir. 1989)).

reimbursement that it pays to J.M. and the Parents.  In fashioning relief, the Court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."  *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 16 (1993). MCPS argues that the reimbursement should be decreased based on "the Parent's actions in the instant case."  ECF No. 28-1 at 42.  However, MCPS does not specifically state which actions would merit a reduction in reimbursement.  The Parents did what the law allows—contest MCPS' provision of a FAPE, unilaterally place their child in an educational environment that provides a FAPE, and seek reimbursement.  No grounds exist to reduce the amount awarded.

## IV.    Conclusion

For the foregoing reasons, the Court denies MCPS' motion for summary judgment (ECF No. 28) and grants J.M.'s motion for summary judgment.  ECF No. 34.  A separate Order follows.

March 27, 2019_____              _____/S/_____
Date                                                                  Paula Xinis
                                                                       United States District Judge